UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>NELSON ROMERO-MARTINEZ,<br>*Defendant*. | No. 3:23-cr-176 (JAM) |

**ORDER GRANTING *DE NOVO* REVIEW OF PRE-TRIAL DETENTION ORDER**

The defendant Nelson Romero-Martinez has been charged with an immigration crime of unlawful reentry after removal. He moves for *de novo* review of a magistrate judge's pre-trial detention order. I conclude that the government has not proved by a preponderance of the evidence that Romero-Martinez is a serious risk of flight. Therefore, I will grant his motion for *de novo* review and shall convene a hearing to set conditions of release.

**BACKGROUND**

I accept the following facts as true.[1] Romero-Martinez is a citizen of Honduras. But he has lived in Connecticut without legal documentation for most of the past 18 years. He has a partner of 12 years, as well as his children and several siblings, who also live in Connecticut.

Romero-Martinez has a long and troubling history of violating the law. After first entering the United States unlawfully, he was convicted in 2007 in Connecticut state court on two counts of second-degree assault and possibly a charge of unlawful restraint.[2] This conviction

---

[1] The underlying facts do not appear to be in material dispute. The facts concerning Romero-Martinez's family ties and connections to Connecticut are drawn from Romero-Martinez's motion for review. Doc. #29. The facts concerning Romero-Martinez's criminal history are drawn from the government's opposition to Romero-Martinez's motion for release, Doc. #31, as well as from the police report of his arrest in August 2023. The government is requested again for completeness of the record to file on the docket a copy of the police report (with any necessary redactions).

[2] The government states at one point that Romero-Martinez was convicted on a charge of unlawful restraint but then states at another point that "[r]ecords are unclear whether ROMERO was convicted of this charge." Doc. #31 at 3.

1

primarily arose from an incident in 2005 when he got into an altercation at a birthday party and stabbed at least two people. A state court sentenced Romero-Martinez to a five-year term of imprisonment, and then he was removed for the first time to Honduras in 2010.

In 2012, Romero-Martinez was arrested without documentation in Texas, convicted for a misdemeanor of unlawful reentry, and removed for a second time to Honduras. About six months later it happened all over again—he was caught in Texas, convicted for a misdemeanor of unlawful reentry, and removed to Honduras now for a third time.

Romero-Martinez then managed to sneak back into the United States but was arrested for a traffic violation in Connecticut in 2016. This resulted in his removal for a fourth time to Honduras.

But Romero-Martinez came back to Connecticut yet again and was arrested in Bridgeport, Connecticut on the night of Saturday, August 5, 2023. The police responded that night to a report that a man had been stabbed in the chest in front of the Sunshine Deli on Park Avenue at a location very near Romero-Martinez's home.

According to the police report, a witness saw Romero-Martinez and the victim in a fight. The victim was found on the scene bleeding from a stab wound to his chest and initially declined to cooperate with the police investigation but eventually identified Romero-Martinez as his assailant. He told the police that he and Romero-Martinez were usual drinking buddies but they had gotten into an argument about one of Romero-Martinez's friends. Then, according to the victim, Romero-Martinez walked away and came back and stabbed him with something. The victim was taken to the hospital where it was determined that the wound was non-life threatening.

Romero-Martinez surrendered to the police that night when they came to his house. He was given medical attention on the scene and then taken to the hospital after he reported that he had been struck in the head with a bottle. Following his release from the hospital, Romero-Martinez was taken to the police station for booking and processing. He gave a false name (Jose Del Arca), but his true identity came to light after the police ran his fingerprints.

The state court released Romero-Martinez on a $100,000 bond, and a first-degree assault charge remains pending against him in Connecticut state court. Following his release on bond, he was required to wear an ankle monitor, and he voluntarily appeared for two court hearings in state court while on release.

More than two months after his state court arrest, Romero-Martinez was arrested on October 20, 2023 on a federal charge of unlawful reentry after removal, in violation of 8 U.S.C. § 1326. The government moved for detention on the ground that Romero-Martinez was a serious risk of flight pursuant to 18 U.S.C. § 3142(f)(2)(A).[3] Magistrate Judge Vatti initially granted the motion without objection and without prejudice to a motion for reconsideration.[4]

On November 16, 2023, Romero-Martinez moved for release on bond, and the government filed an objection.[5] There was some concern at the outset that it would make no sense for Romero-Martinez to be released on bond because he could be detained for removal by U.S. Immigration and Customs Enforcement ("ICE"). But ICE has advised that it does not seek to detain Romero-Martinez, and that, if Romero-Martinez is released, then ICE would subject him to GPS monitoring if he were not already subject to it by the U.S. Probation Office.[6]

---

[3] Doc. #5 at 2. The government's motion also alleged that Romero-Martinez was a serious risk to obstruct justice pursuant to 18 U.SC. § 3142(f)(2)(B). But the government has not continued to press that claim.
[4] Doc. #13.
[5] Doc. #16, #17.
[6] Doc. #28 at 6-7.

After a hearing on December 7, 2023, Judge Vatti granted the government's motion for pre-trial detention and denied Romero-Martinez's cross-motion for release.[7] Judge Vatti's ruling stated in principal part:

> In summary, the government moved for detention under 18 U.S.C. Section 3142(f)(2) and, accordingly, the Court considered only whether the government had established by a preponderance of evidence that the defendant posed a serious risk of flight and that there were no conditions which would reasonably assure the defendant's appearance. Although the Court was aware that an ICE detainer had been lodged against the defendant, the Court did not consider its existence as a factor in the bond determination for reasons explained on the record. After consideration of the Section 3142(g) factors, the Court concludes that the government met its burden. Here, the defendant has previously been deported on four occasions only to re-enter the country each time without permission and used an alias on the most recent occasion to avoid detection, indicating a significant risk that he will not abide by Court conditions. Further, he faces a significant felony assault charge arising out of a stabbing pending in state court. Given his prior criminal history, which includes a prior assault conviction arising out of multiple stabbings and another conviction for unlawful restraint, he faces a potentially substantial sentence in the pending state matter, which further incentivizes flight, particularly where defendant has shown the resourcefulness to re-enter the country after flight and the use of alternate identities. Accordingly, the Court concludes defendant poses a serious risk of flight. Lastly, the proposed third-party custodian and co-signers do not sufficiently mitigate the risk of flight and assure the defendant's appearance. The proposed custodian has been the defendant's partner for over 12 years, and it is likely she is aware of his history of deportations and illegal re-entries. Given that he was residing with the proposed custodian for the past five years, there is an inference that she also may have been aware of the defendant's use of an alias on this most recent occasion after re-entry. Further, defendant proposes to return to the same neighborhood and to the same residence where he was living at the time of the alleged offense conduct underlying the state assault charge. Indeed, his residence is in very close proximity to the scene of the alleged stabbing. For these reasons, the Court has serious doubts in relying upon the proposed custodian to serve as the eyes and ears of the Court to ensure that defendant abides by conditions and appears in Court. Finally, the co-signers are not at all financially viable to incentivize defendant to appear and not place the co-signers in financial peril. One co-signer is unemployed, one collects disability benefits and, while the proposed custodian is employed, she works only 24 hours per week at a relatively low hourly wage.

---

[7] Doc. #26.

Romero-Martinez has now moved pursuant to 18 U.S.C. § 3145(b) for *de novo* review of Judge Vatti's order.[8] I held a hearing and requested supplemental briefing from the parties.[9] This ruling now follows.

## DISCUSSION

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). A defendant may be detained prior to trial only in compliance with the requirements of the Bail Reform Act of 1984.

The Bail Reform Act prescribes certain gateway criteria that must be satisfied as a threshold matter before a court may order pre-trial detention. *See* 18 U.S.C. § 3142(f)(1)-(2). [10] Here, the government premised its detention motion on one of those gateway criteria—a "serious risk that such person will flee," 18 U.S.C. § 3142(f)(2)(A). The government does not argue that Romero-Martinez qualifies for detention under any of the other gateway criteria set forth in § 3142(f). In particular, he is not federally charged with a crime of violence or any of the most serious types of crimes that the Bail Reform Act allows as a predicate for a detention motion. *See*

---

[8] Doc. #29.
[9] Docs. #32, #33, #36, #37, and #38.
[10] The Bail Reform Act frames the threshold inquiry in terms of whether there shall be a "hearing" at all on the issue of detention. *See* 18 U.S.C. § 3142(f). But it is the long and salutary practice in the District of Connecticut for a hearing to be conducted on the issue of detention after the government files a detention motion and upon a defendant's request if the defendant wishes to oppose. One could argue that the very fact that Romero-Martinez did not oppose detention at his initial presentment and that Judge Vatti later conducted a hearing means that Romero-Martinez has waived or forfeited his objection to the adequacy of the government's threshold showing or to a hearing being conducted. *See United States v. Subil*, 2023 WL 3866709, at *5 (W.D. Wash. 2023). But one could equally argue that the fact that the government filed no more than a boilerplate motion with no showing in the motion of any evidence of risk of flight means that the government was not even entitled to a hearing in the first place and that it was error for Judge Vatti and me to conduct any "hearing" at all as we both have. I am not persuaded by either technical argument. I understand the significance of the "hearing" requirement in § 3142(f) to mean that a court must engage in a threshold inquiry as to the *prima facie* grounds for pre-trial detention and that it may do so—as courts ordinarily do whenever there are disputes about the facts or law—by means of conducting a hearing to receive the arguments of all parties (*i.e.*, to conduct a hearing about whether to have a hearing).

5

18 U.S.C. § 3142(f)(1).[11] Nor is there any evidence that he is a serious risk to engage in witness tampering or similar efforts to obstruct justice. *See* 18 U.S.C. § 3142(f)(2)(B).

The government insists that Romero-Martinez is a danger to the community. Danger to the community, however, is not one of the gateway criteria for detention under § 3142(f). And the Second Circuit has made clear that "[t]he question whether the defendant poses a danger to the safety of the community … cannot be considered unless the defendant is found to be eligible for detention under subsection 3142(f)." *United States v. Dillard*, 214 F.3d 88, 96 (2d Cir. 2000). "A defendant who is not eligible *must be released*, notwithstanding dangerousness." *Ibid.* (emphasis added).

Therefore, the government's burden is to prove by a preponderance of the evidence that Romero-Martinez is a serious risk of flight. *See United States v. Watkins*, 940 F.3d 152, 158 (2d Cir. 2019). A "serious risk of flight" means "a great risk—beyond average—that the defendant will intentionally and actively move within or outside the jurisdiction to avoid court proceedings or supervision." *United States v. Figueroa-Alvarez*, 2023 WL 4485312, at *5 (D. Idaho 2023). "[T]he Government must demonstrate that it is more likely than not that there is a serious *risk* that the defendant will flee, not that that it is more likely than not that the defendant *will* flee." *Ibid.*

---

[11] Even if a defendant is not charged with a crime of violence or one of the most serious types of crimes specified under § 3142(f)(1), the Bail Reform Act allows *any* federal felony charge to serve as a basis for a detention motion if the defendant has been previously convicted of two or more offenses that are a crime of violence or other qualifying offense. *See* 18 U.S.C. § 3142(f)(1)(D). Although Romero-Martinez has been previously convicted for two counts of second-degree assault, the government has not moved for detention on the ground that these two convictions qualify as crimes of violence. *Cf. United States v. Moreno*, 821 F.3d 223, 228 (2d Cir. 2016) (noting that Connecticut's second-degree assault statute "defin[es] several distinct offenses, most of which would constitute 'crimes of violence' within the meaning of 18 U.S.C. § 16(a), but at least one of which would not").

I have carefully considered the record and conclude that the government has not proved by a preponderance of the evidence that Romero-Martinez is a serious risk of flight. I will address the government's various points in turn.

First and primarily, the government contends that a risk of flight may be inferred from the fact that Romero-Martinez has a long history of disobeying the law by means of entering and re-entering the United States unlawfully. But because Romero-Martinez's family ties in Connecticut are very strong, this argument sharply cuts the other way as well. It tends to show that Romero-Martinez's commitment to be with his family in Connecticut—rather than to hide out in Honduras or elsewhere—is so compelling that he will break the law and risk his freedom to do so.

The relevant inquiry at this point is Romero-Martinez's risk of flight, not his general propensity to break the law. Although these inquiries overlap to some degree, if the facts of a case suggest that a defendant's primary motive for breaking the law is to enter and remain in the jurisdiction where he is subject to prosecution, these facts make the connection between general law breaking and risk of flight more tenuous. "Indeed, the very act of illegally reentering the United States—knowing that reentry subjects the alien defendant to a potential prison term and certain deportation thereafter—demonstrates a firm resolve to reside in this country, especially when done multiple times." *Figueroa-Alvarez*, 2023 WL 4485312, at *10; *see also United States v. Muñoz-Correa*, 2023 WL 5672203, at *3 n.23 (D. Utah 2023) (noting that, although the defendant "has shown disrespect for the United States' immigration laws by ignoring his removal order … and quickly returning despite being fully aware that he was not eligible to even apply to return to the United States for at least 10 years," this fact "does not cut in the United

States' favor because [the defendant's] clear disrespect for the United States' immigration law manifested itself in him returning to the United States and staying for over 12 years").

The government protests that it "rewards the defendant's criminality" to give him credit for repeatedly violating the law to be with his family in Connecticut.[12] But the Bail Reform Act requires a judge to consider *all* the circumstances that bear on the issue of flight. A court may consider a defendant's past criminal conduct, including the defendant's reasons or motives for this conduct. A court may rely on all these circumstances of past criminal conduct even if— ironically enough—they turn out to be favorable to a defendant on the issue of flight. By considering all the circumstances, a court does not "reward" a defendant's "criminality." Instead, it discharges its duty under the Bail Reform Act to consider all the circumstances that bear on the risk of flight.

Relatedly, the government points to Romero-Martinez's prior assault convictions from 2007 as well as his pending assault charge. But this conduct goes far more to the issue of dangerousness than it does to the threshold risk of flight. It also cuts in part against the government on the issue of flight. Before Romero-Martinez was arrested on the federal immigration charge, he was released on bond on the state assault charge, and he twice appeared for court hearings in the state case without taking flight. Evidently, the state's bond conditions were enough to deter Romero-Martinez from fleeing. *See Muñoz-Correa*, 2023 WL 5672203, at *4 ("despite likely being aware of the immigration consequences of being prosecuted for misdemeanor assault under Utah law, [the non-citizen defendant] attended his hearings and did not flee despite having every incentive to do so" and "[t]his shows that even though [the defendant] may have the ability to flee, he instead has reliably attended his court hearings").

---

[12] Doc. #31 at 8.

The government also cites the fact that Romero-Martinez furnished a false name to the police when he was arrested in August 2023 for assault. But it does not appear from the police report that Romero-Martinez furnished a false name in order to avoid accountability for the alleged assault against the victim or that he otherwise tried to evade arrest by the police when they came to his house. His use of a false name is only marginally probative of a serious risk of flight.

The government further argues that Romero-Martinez is a serious risk of flight because of the strength of evidence and significant sentences of imprisonment he faces for his state and federal charges. I will assume that the evidence against Romero-Martinez for both the federal and state charges is quite strong. According to the government, Romero-Martinez faces a five-year mandatory minimum prison sentence if he is convicted of the first-degree assault charge. Although the government claims that Romero-Martinez also faces a "long" prison sentence for the federal reentry charge, it does not describe the likely Guidelines range. Nevertheless, I will assume in light of his aggravating criminal history and large number of prior unlawful reentries that Romero-Martinez is facing a few or several years in prison for the federal charge as well.

Still, as the Second Circuit has observed, "we have required more than evidence of the commission of a serious crime and the fact of a potentially long sentence to support a finding of risk of flight." *United States v. Friedman*, 837 F.2d 48, 50 (2d Cir. 1988) (*per curiam*). Thus, the Second Circuit in *Friedman* reversed an order of detention involving a child pornography defendant despite the government's contention "that Friedman presents a serious risk of flight because of the nature of the charges against him, the strength of the government's case, the long sentence of incarceration he may receive, his age and the obloquy that he faces in his community." *Id.* at 49. It did so because it was "undisputed that Friedman is a life-long New

9

York resident, that he has no prior criminal record, that he has no passport or known ability to evade surveillance, that he has worked gainfully in the New York area for twenty-five years prior to his arrest, and that he is married and has three children, all of whom live in the New York area." *Id.* at 49-50.

The Second Circuit also relied on the fact that Friedman did not flee "after federal agents executed a search warrant at his home" or "after he was arrested at home on state charges three weeks later," and that "bail has been set for Friedman on the state charges, which are far more serious than those charged in this case." *Id.* at 50. As noted above, the same holds true for Romero-Martinez in this case: he did not flee after he was arrested for a more serious state charge. Nor did he flee after a state bond was set but instead appeared for state court proceedings. It would be speculative to conclude that the fact of the later and less serious federal charge will be the tipping point that prompts Romero-Martinez to flee.

This is also not a case involving a defendant of demonstrated financial resources who could feasibly relocate and effectively cover his tracks in doing so. If Romero-Martinez weighs the costs and benefits, he will know that flight would likely lead to eventual apprehension when he inevitably tried to reunite with his family again in Connecticut, and the various consequences would be even more severe. To begin, he would forfeit the bond he has posted for the state criminal case, as well as the bond that I intend to require when he is released. Moreover, the sentences he would receive in both state and federal court would likely be far higher.

Nor can I presume that simply because of his status as an undocumented non-citizen Romero-Martinez is more likely to flee than other defendants who face criminal charges. There is a "common misconception" that "alien defendants granted pretrial release are more likely to fail to appear or flee than defendants who are United States citizens or lawful residents."

*Figueroa-Alvarez*, 2023 WL 4485312, at *6. According to data compiled by the U.S. Department of Justice from 2011 to 2018, undocumented non-citizen defendants who were "granted pretrial release (i) failed to appear at a rate of 0.5 percent; (ii) committed technical violations of conditions of release at a rate of 1.6 percent; (iii) were rearrested for a new offense at a rate of 0.2 percent; and (iv) had their pretrial release revoked at a rate of 1.1 percent." *Ibid.* (citing Table 9, Pretrial Release and Misconduct in Federal District Courts, Fiscal Years 2011–2018 (ojp.gov)). These rates are *lower* than the rates for U.S. citizen defendants and documented non-citizen defendants. *Ibid.*

All in all, I am not convinced by a preponderance of the evidence that Romero-Martinez is a serious risk of flight. Other courts in similar circumstances have declined to detain defendants facing federal unlawful reentry charges. *See Muñoz-Correa*, 2023 WL 5672203, at *3 (undocumented non-citizen defendant was not serious risk of flight despite pendency of federal unlawful reentry charge as well as a state court charge for assault and for which he had appeared without flight at state court proceedings); *Figueroa-Alvarez*, 2023 WL 4485312, at *13 (undocumented non-citizen defendant was not serious risk of flight despite fact that he had "four illegal reentries after removals [that] demonstrate his disrespect for the law"); *United States v. Chavez-Rivas*, 536 F. Supp. 2d 962, 968-69 (E.D. Wis. 2008) (denying detention motion based on risk of flight where defendant from Mexico had no legal status and had prior convictions for assault with a deadly weapon and drug offenses and faced "a significant prison sentence" for illegal reentry, but where defendant also had "strong family and community ties," including residence in the jurisdiction for 10 years, a marriage of more than 10 years, and five children).

The government misplaces its reliance on *United States v. Salgado*, 2020 WL 4747931 (D.R.I. 2020). That case involved the detention of an undocumented non-citizen who had "four

11

Rhode Island warrants for failing to appear, two of them quite recent (2018/2019), as well as three open warrants in New York." *Id.* at *5. Here, by contrast, Romero-Martinez has no record involving failure to appear. The *Salgado* case also involved a defendant who had made an "admission of longstanding Sur-13 gang membership [which] is a community tie with negative connotations, particularly the facilitation of flight." *Id.* at *6.[13]

The government also misplaces its reliance on *United States v. Cobix-Espinoza*, 655 F. Supp. 3d 584 (E.D. Ky. 2023). In that case, the defendant waived his right to argue that the government had not met its threshold burden to establish a risk of flight. *See id.* at 589. The case therefore turned on whether a court could consider evidence of dangerousness at the next stage of deciding whether to detain a defendant who had already been proven to be a serious flight risk. *See id.* at 589-94. Here, however, Romero-Martinez has contested the threshold burden to establish a serious risk of flight.

Because the government has not proved by a preponderance of the evidence that Romero-Martinez poses a serious risk of flight, I must consider the conditions of release in compliance with the Bail Reform Act. *See* 18 U.S.C. § 3142(a), § 3142(c). The Act requires in relevant part that, if the Court finds that release of a defendant on personal recognizance or with an unsecured bond "will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community, such judicial officer shall order the pretrial release of the person" subject to certain conditions, including "the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the

---

[13] The government suggests that there is an "NCIC database" in which Romero-Martinez "was listed as a 'Possible National Security Threat' due to his association with the 18th Street Gang in Bridgeport." Doc. #31 at 2. But the government has not substantiated this claim of gang membership, much less suggested that Romero-Martinez has admitted to any such membership as did the defendant in *Salgado*.

appearance of the person as required and the safety of any other person and the community." §3142(c)(1) & (1)(B).

I shall conduct a hearing as soon as possible to hear further from the parties concerning appropriate conditions of release. I anticipate imposing the conditions proposed by Romero-Martinez but will also consider additional conditions including GPS monitoring. Romero-Martinez must ensure that all of his proposed sureties are present at the hearing and available to answer questions that I will have.

On the basis of the showing made by Romero-Martinez that it would not violate the law if he were to work as an independent contractor, I anticipate allowing Romero-Martinez to work as an independent contractor subject to his production of a Taxpayer Identification Number and notification to the U.S. Probation Office of the name and contact information of any person for whom he intends to furnish independent contractor services. *See Muñoz-Correa*, 2023 WL 5672203, at *4 (allowing undocumented non-citizen released on bond to lawfully work as independent contractor). The government has not shown that it would be unlawful for Romero-Martinez to work as an independent contractor.

## CONCLUSION

For the reasons set forth above, the Court GRANTS the motion of defendant Nelson Romero-Martinez for *de novo* review of the detention order (Doc. #29). The Court shall promptly convene a hearing to set conditions of release.

It is so ordered.

Dated at New Haven this 6th day of March 2024.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge